EDWIN M. JONES OIL
COMPANY, Appellant,

v.

PEND OREILLE OIL & GAS
COMPANY, Appellee.

No. 13–89–481–CV.

Court of Appeals of Texas,
Corpus Christi.

May 31, 1990.

Rehearing Overruled June 29, 1990.

Second Motion for Rehearing
Overruled Aug. 31, 1990.

Benjamin F. Youngblood, III, San Antonio, Harry Schulz, Jr., Schulz & Schulz, Three Rivers, for appellant.

Dean Patton, Morrill & Patton, Beeville, William L. Hardwick, George West, Shirley Selz, William D. Granberry, Valerie Fogleman, Gary, Thomasson, Hall & Marks, Corpus Christi, for appellee.

Before NYE, C.J., and BENAVIDES and KEYS, JJ.

## OPINION

NYE, Chief Justice.

Appellant, Edwin M. Jones Oil Company sued appellee, Pend Oreille Oil & Gas Company seeking a declaratory judgment that Jones owned a working interest share in the Geffert Gas Unit which included the

Geffert No. 1 Well and the Geffert No. 2 Well. Jones also sought an accounting and recovery for its share of the natural gas production from these two wells, together with its costs and attorneys fees. Pend Oreille counterclaimed, alleging that it erroneously paid Jones royalties on unit production from the Geffert Gas Unit. The jury found that Jones owned a one-third working interest in the Geffert No. 1 Well and awarded Jones $98,862.64 for its share of this well's production. The jury further found that Jones did not own a working interest in the Geffert No. 2 Well. The jury awarded Jones $25,000.00 in attorneys fees.

On appeal, Jones challenges the trial court's judgment in three points of error. Pend Oreille, as cross-appellant, challenges the trial court's judgment by four points of error. We affirm the trial court's judgment.

According to a "FARMOUT AGREE-MENT" dated November 6, 1979, Jones, Frost National Bank, trustee, d/b/a Peet Oil Co., and the Estate of Gilbert M. Denman, deceased, represented to Pend Oreille that they owned the minerals in eighty acres of land in Live Oak County, Texas (herein called the Jones Tract).[1] The farmout agreement indicates that Pend Oreille agreed to drill a test well on or offsetting the Jones Tract, and if the well resulted in a commercial gas well, Jones would deliver to Pend Oreille an oil and gas lease. Upon receipt of the lease, Pend Oreille was required to form a gas unit to include all of the lease in accordance with the pooling provisions contained in the lease.

If Pend Oreille earned the lease and made a commercial well, Jones had the option to convert the one-eighth of eight-eighths override added to the royalty in the lease to a one-third working interest in the well and the acreage allocated to the well. The farmout agreement also provided that "[o]n unit production we [Jones] will participate to the extent of one-third (⅓) of the working interest under our lease on a sur-

face acreage basis; that is, in the production allocated to our lease acreage."

Pend Oreille earned the lease by drilling a well on the Jones Tract. The lease, dated June 1, 1980, covered the Jones Tract. This well, known as the Peet Well, produced natural gas from the Fant Field. In proceedings before the Texas Railroad Commission, Pend Oreille introduced geological maps showing that approximately one-half of the Jones Tract fell within the Fant Field.

Section three of the lease required Pend Oreille to pay a one-eighth royalty on oil, gas and casinghead gas produced from the Jones Tract. With regard to pooling, section four provides, in relevant part:

4. Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof as to oil and gas, or either of them, with any other land covered by this lease, and/or with any other land, lease or leases in the immediate vicinity thereof to the extent hereinafter stipulated, when in Lessee's judgment it is necessary or advisable to do so in order properly to explore, or to develop and operate said leased premises in compliance with the spacing rules of the Railroad Commission of Texas, or other lawful authority, or when to do so would, in the judgment of Lessee, promote the conservation of oil and gas in and under and that may be produced from said premises.

.    .    .    .    .

The pooling in one or more instances shall not exhaust the rights of the Lessee hereunder to pool this lease or portions thereof into other units. Lessee shall file for record in the appropriate records of the county in which the leased premises are situated an instrument describing and designating the pooled acreage as a pooled unit; and upon such recordation the unit shall be effective as to all parties hereto, their heirs, successors, and assigns, irrespective of whether

---

1. This appeal actually concerns only Edwin M. Jones Oil Company. For purposes of the farmout agreement, Jones, Frost National Bank, trustee, d/b/a Peet Oil Co., and the Estate of Gilbert M. Denman, deceased, will be referred to collectively as "Jones".

or not the unit is likewise effective as to all other owners of surface, mineral, royalty, or other rights in land included in such unit.

.    .    .    .    .

For the purpose of computing the royalties to which owners of royalties and payments out of production and each of them shall be entitled on production of oil and gas, or either of them, from the pooled unit, there shall be allocated to the land covered by this lease and included in said unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) a pro rata portion of the oil and gas, or either of them, produced from the pooled unit after deducting that used for operations on the pooled unit.

On December 12, 1980, Pend Oreille executed a document establishing the 320 acre Peet Gas Unit. The Peet Gas Unit included the entire Jones Tract. On December 13, 1982, Pend Oreille advised Jones that payout on the Peet Well occurred. On January 4, 1983, Jones converted its one-eighth of eight-eighths overriding royalty to a one-third working interest in the well and farmout acreage allocated to the well. After this conversion, the Peet Well ceased production, and Pend Oreille drilled a replacement well, the Geffert No. 1. This well was drilled in the Peet Gas Unit, but it did not fall on the Jones Tract.

On May 16, 1983, Pend Oreille executed a document establishing the 352 acre Geffert Gas Unit. The Geffert Gas Unit included the entire Jones Tract. Jones did not sign the document designating the Geffert Gas Unit. On this same date, Pend Oreille filed a "CERTIFICATE OF POOLING AUTHORITY" with the Texas Railroad Commission. Paragraph one states that the Geffert Gas Unit is the acreage claimed for the purpose of establishing a pooled drilling or proration unit. Paragraphs two and three state:

(2) That the pooled unit described in the preceding paragraph is made up of and contains the hereafter described individual tracts of land no part of which is embraced within any other pooled unit in the same field and which, by virtue of the pooling agreements referred to in the preceding paragraph, are now contained within the pooled unit herein described.

(3) That where a non-pooled undivided interest exists in any of the individual tracts pooled, that certain non-pooled interest is noted in the margin of this instrument beside the tract description to identify the existence of the non-pooled interests in that tract:

The pooling certificate indicates that Pend Oreille pooled the Jones Tract into the Geffert Gas Unit. The certificate indicates that a non-pooled interest does not exist in the Jones Tract.

Pend Oreille dissolved the Peet Gas Unit effective June 9, 1983. After the Geffert No. 1 Well ceased production, Pend Oreille drilled the Geffert No. 2 Well. Pend Oreille drilled the Geffert No. 2 Well in the Geffert Gas Unit on a tract that had not been included in the Peet Gas Unit. The Peet Well and both Geffert wells, however, were drilled into the Fant Field.

In its first point of error, Jones complains that the trial court erred in failing to grant its motion for judgment n.o.v. concerning Special Question No. 2. This question asked, "What percentage, if any, do you find by a preponderance of the credible evidence does the Edwin M. Jones Oil Company own in the mineral working interest in the Geffert No. 2 Well?" The jury answered that Jones owned no mineral working interest. By five sub-points, Jones contends: that Pend Oreille is estopped from claiming it owned no working interest in the Geffert No. 2 Well, or, alternatively, that it waived this claim; that the jury finding that it owned a working interest in the Geffert No. 1 Well establishes, as a matter of law, that it owns a working interest in the Geffert No. 2 Well; and that the evidence is factually and legally insufficient to support the jury's finding.

In considering "no evidence" and "insufficient evidence" points of error, we will follow the well-established test set forth in Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 Texas L.Rev. 361 (1960). The evidence shows

that the Geffert No. 2 Well was drilled in the Geffert Gas Unit. The subject well was not drilled on acreage lying within the Peet Gas Unit; rather, it was drilled in acreage lying outside of the Peet Gas Unit. Jones did not execute the document designating the Geffert Gas Unit. Neither the 1980 oil and gas lease nor the 1979 farmout agreement purport to grant Jones or Pend Oreille the authority to pool a working interest owned by another. Moreover, nothing in the lease or the farmout agreement purports to grant Pend Oreille the authority to pool any interest of Jones except its royalty interest. Absent the express authority to do so, a lessee has no right to pool the mineral interest in the estate retained by the lessor with those of other lessors. *Jones v. Killingsworth,* 403 S.W.2d 325, 328 (Tex.1965). In the instant case, Jones, as lessor, authorized Pend Oreille, as lessee, under the 1980 lease to pool its royalty interest. Jones never authorized Pend Oreille to pool its working interest. We conclude there is no evidence to show that Jones had a contractual relationship with Pend Oreille concerning a mineral working interest in the Geffert No. 2 Well. We hold, therefore, that Jones has no right to a mineral working interest share in that well.

■ Jones argues that Pend Oreille is estopped from claiming that it does not own a working interest in the Geffert No. 2 Well, or, alternatively, that Pend Oreille waived this claim. Pend Oreille assets that Jones failed to plead waiver and estoppel and the facts essential to its existence in accordance with Tex.R.Civ.P. 94. Pend Oreille's counterclaim alleges that it erroneously paid to Jones royalties on unit production from the Geffert Gas Unit. Jones' answer to this counterclaim alleged "that Pend Oreille is estopped from showing that Jones is not an owner of" a "working interest" in the Geffert Gas Unit. Jones' answer also alleges that "Pend Oreille waived any right to ... sue for royalties paid" from the Geffert Gas Unit. Pend Oreille leveled no special exceptions to defects in Jones' answer as required by Tex.R.Civ.P. 90 and 91. Accordingly, Jones' argument has been preserved for our review. *Cf.*

*Pioneer Oil Co. v. Vallejo,* 750 S.W.2d 928, 929 (Tex.App.—Corpus Christi 1988, no writ); *Manufactured Housing Management Corp. v. Tubb,* 643 S.W.2d 483, 487 (Tex.App.—Waco 1982, writ ref'd n.r.e.); *Hennigan v. Harris County,* 593 S.W.2d 380, 383 (Tex.Civ.App.—Waco 1979, writ ref'd n.r.e.).

■ Waiver and estoppel are separate and distinct legal doctrines. Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Sun Exploration and Production Co. v. Benton,* 728 S.W.2d 35, 37 (Tex.1987). Waiver is a voluntary act and implies an election to dispense with something of value or to forego some advantage which might have been demanded or insisted upon. *El Paso Development Co. v. Berryman,* 769 S.W.2d 584, 589 (Tex.App.—Corpus Christi 1989, writ denied). Without an express renunciation of a known right, a waiver will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has been misled to his prejudice into an honest belief that such waiver was intended or assented to. *El Paso Development,* 769 S.W.2d at 589–90.

■ Estoppel, on the other hand, arises "where by fault of one, another has been induced to change his position for the worse." *See Wirtz v. Sovereign Camp, W.O.W.,* 114 Tex. 471, 268 S.W. 438, 441 (1925); *Vallejo,* 750 S.W.2d at 929. To constitute an equitable estoppel, there must exist: (1) a false representation or concealment of material facts; (2) made with actual or constructive knowledge of the facts; (3) to a party without knowledge, or the means of acquiring knowledge of the real facts; (4) made with the intention that it should be acted on; and (5) the party to whom it was made must have relied on or acted on it to his prejudice. *Vallejo,* 750 S.W.2d at 929; *see also Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 932 (1952) and *Swiderski v. Prudential Property and Casualty Insurance*

*Co.*, 672 S.W.2d 264, 269 n. 2 (Tex.App.—Corpus Christi 1984, writ dism'd).

■ Jones claims that certain documents estop Pend Oreille from denying that it has a working interest in the Geffert No. 2 Well. Jones directs our attention to three letters from Pend Oreille identifying Jones as a working interest owner in the Geffert Gas Unit. Jones also states that the "CERTIFICATE OF POOLING AUTHORITY" indicates that there were no unpooled interests in the Geffert Gas Unit. These documents, however, do not show that Pend Oreille has unequivocally designated Jones as a working interest owner in the Geffert No. 2 Well.

■ Pend Oreille filed a "STATEMENT OF PRODUCTIVITY OF ACREAGE ASSIGNED TO PRORATION UNITS" signifying that the Geffert No. 2 Well was completed in the Fant Field and that 123 acres assigned to this well can be considered productive. Jones alleges that nearly one-third of the Jones Tract is included within the 123 acres. The evidence shows, however, that Jones did not join in or consent to the designation of the Geffert Gas Unit. The Geffert No. 2 Well was drilled in acreage lying outside the original Peet Gas Unit boundaries. We conclude that Pend Oreille did not intentionally relinquish its right to claim that Jones did not have a working interest in the Geffert No. 2 Well.

■ Jones' contention that the jury finding that it owned a working interest in the Geffert No. 1 Well establishes, as a matter of law, that it owns a working interest in the Geffert No. 2 Well is without merit. The Geffert No. 1 Well was drilled in the Peet Gas Unit. The Geffert No. 2 Well was drilled into acreage lying completely outside of the original Peet Gas Unit. Neither the 1979 farmout agreement nor the 1980 oil and gas lease give Pend Oreille the right to pool Jones' working interest in the Peet Gas Unit. Jones did not sign the document designating the Geffert Gas Unit.

In its second point of error, Jones complains that the trial court erred in failing to grant its motion for judgment n.o.v. concerning Special Question No. 4. This question asked, "What amount of money, if any, do you find is due to the Edwin M. Jones Oil Company for the value of all its working interest, if any, in the production of the Geffert No. 2 Well?" Because we have already determined that Jones does not own a mineral working interest share in the Geffert No. 2 Well, discussion of this point is unnecessary. Tex.R.App.P. 90(a).

In its third point of error, Jones complains the trial court erred by failing to grant its motion for judgment n.o.v. concerning Special Question No. 5. This question asked, "What sum of money, if any, do you find from a preponderance of the evidence would reasonably compensate the attorneys of Edwin M. Jones Oil Company for their services in this case ...?" The jury awarded Jones $25,000.00 for preparation of the trial but made no award for appeal to this Court or to the Texas Supreme Court.

■ Jones sought attorneys fees under the Texas Declaratory Judgment Act, Tex.Civ.Prac. & Rem.Code Ann. § 37.009 (Vernon 1986), and under Tex.Civ.Prac. & Rem.Code Ann. § 38.001 (Vernon 1986). Section 37.009 provides that "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." The grant or denial of attorney's fees in a declaratory judgment action lies within the sound discretion of the trial court. Its judgment will not be reversed on appeal absent a clear showing that it abused that discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985); *Baldwin v. Barbon Corp.*, 773 S.W.2d 681, 686 (Tex.App.—San Antonio 1989, writ denied). The legal principle embodied in the phrase "abuse of discretion" contemplates some legal error committed by the trial court in its award that injured or prejudiced the party seeking attorneys fees. *Jennings v. Minco Technology Labs, Inc.*, 765 S.W.2d 497, 503 (Tex.App.—Austin 1989, writ denied). The trial court's discretion in this matter has been construed broadly. Decisions have been upheld where the trial court failed to award attorney's fees to the

prevailing party and where the trial court awarded attorney's fees to the losing party. *Oake,* 692 S.W.2d 454; *District Judges of Collin County v. Commissioners Court of Collin County,* 677 S.W.2d 743, 746 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). Factors to be considered in determining the reasonableness of the attorneys fees include: time and labor involved, nature and complexities of the case, the value of the interest involved, the extent of the responsibilities assumed by the attorney, and the benefits resulting to the client from the attorney's services. *A.H. Belo Corp. v. Southern Methodist University,* 734 S.W.2d 720, 724 (Tex.App.—Dallas 1987, writ denied).

■ In the instant case, Jones' general counsel, Benjamin F. Youngblood, III, testified that he and his assistant counsel incurred reasonable and necessary attorneys fees of $40,490.30. He said that his hourly rate is $125.00 per hour. He spent approximately 227.6 hours for preparation and trial. He incurred $6,973.00 in expenses. His assistant counsel incurred $5,176.40 in fees and expenses. Youngblood testified that an appeal to this Court would cost $10,000.00 and that an appeal to the Texas Supreme Court would cost $10,000.00. He also estimated that $15,000.00 would cover the cost of the appeals. Jones prevailed in its claim for a working interest in the Geffert No. 1 Well but did not succeed in its claim for a working interest in the Geffert No. 2 Well. Jones points out no circumstances which r\ .der the trial court's failure to award it the requested attorneys fees inequitable or unjust. We conclude that the trial court acted within its discretion.

■ Section 38.001 permits recovery of attorneys fees in suits based upon written contracts. *Lyons v. Montgomery,* 701 S.W.2d 641, 644 (Tex.1985); *Hauglum v. Durst,* 769 S.W.2d 646, 652 (Tex.App.—Corpus Christi 1989, no writ). A party who is entitled to recover under a breach of contract claim is also entitled to recover a reasonable attorneys fee. *Praeger v. Wilson,* 721 S.W.2d 597, 601 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.).

Here, the court heard testimony from Jones' counsel regarding reasonable and necessary attorneys fees prior to making the award. A trial court's judgment will not be reversed on appeal absent a clear showing of abuse of discretion. *Oake,* 692 S.W.2d at 455–56. No such showing has been made by Jones in this case.

■ In its first two points of error, Pend Oreille, as cross-appellant, attacks the factual and legal sufficiency of the evidence to support the findings that Jones owned a one-third working interest in the Geffert No. 1 Well and that Jones is entitled to $98,862.64 in production from this well. The 1979 farmout agreement between Jones and Pend Oreille states that "[o]n unit production we [Jones] will participate to the extent of one-third ($\frac{1}{3}$) of the working interest under our lease on a surface acreage basis; that is, in the production allocated to our lease acreage." After Pend Oreille completed the Peet Well, it formed the Peet Gas Unit. On January 4, 1983, Jones converted its overriding royalty interest in the Peet Gas Unit to a working interest. Jim Fitzpatrick, a landman for Pend Oreille, admitted during trial that Pend Oreille never contested Jones' ownership of a mineral working interest in the Peet Gas Unit. The Geffert No. 1 Well was drilled on a tract lying within the Peet Gas Unit boundaries, and Pend Oreille began drilling this well prior to the time it dissolved the Peet Gas Unit.

According to Pend Oreille's records, the Geffert No. 1 Well produced a total dollar amount of oil, gas and products of $4,274,-670.87. After deducting all costs and taxes associated with the well, the net income was $2,982,830.55. A one-third working interest in Jones' share of its eighty acre lease contributed to the Geffert Gas Unit yields a net revenue interest of .0331439. This net revenue interest multiplied against the net income from the well equals $98,-862.64. This is the amount found by the jury and awarded by the trial court. We hold that the evidence supports the jury's finding that Jones owned a one-third working interest in the Geffert No. 1 Well and

that Jones is entitled to $98,862.64 for the value of its working interest in this well.

In its third cross-point of error, Pend Oreille contends that the trial court erred by awarding prejudgment interest under Tex.Nat.Res.Code Ann. §§ 91.402 and 91.-403 (Vernon Supp.1990) because Jones does not own a working interest in the Geffert No. 1 Well and because statutory exceptions apply. The judgment indicates that the trial court awarded Jones $41,518.78 in prejudgment interest.

Tex.Nat.Res.Code Ann. § 91.402(a) provides, in relevant part, that "[t]he proceeds derived from the sale of oil or gas production from an oil or gas well must be paid to each payee...." Section 91.403 provides, in relevant part:

(a) If payment has not been made for any reason in the time limits specified in Section 91.402(a) of this code, the payor must pay interest to payee beginning at the expiration of those time limits at the rate charged on loans to depository institutions by the New York Federal Reserve Bank, unless a different rate of interest is specified in a written agreement between payor and payee.

(b) Subsection (a) of this section does not apply where payments are withheld or suspended by payor beyond the time limits specified in Section 91.402(a) of this code because there is:

(1) a dispute concerning title that would affect distribution of payments;

(2) a reasonable doubt that the payee does not have clear title to the interest in the proceeds of production....

The facts show that Jones owned the minerals beneath the Jones Tract and leased them to Pend Oreille, retaining its royalty and working interests. Once Jones converted its overriding royalty into a working interest, it had a working interest in the Peet Gas Unit. Pend Oreille admitted during trial that Jones had a mineral working interest in the Peet Gas Unit. There were no third parties making adverse claims against Jones. If confusion existed concerning whether Jones should have received a working interest in the Geffert No. 1 Well's production, Pend Or-

eille could have precluded any claim for interest by tendering the funds into the court's registry or placing them in an interest-bearing escrow account. *See MCZ, Inc. v. Smith,* 707 S.W.2d 672, 677 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). We hold that the trial court properly awarded prejudgment interest to Jones.

In its fourth cross-point of error, Pend Oreille complains that the trial court improperly awarded attorneys fees because there is no legal basis for a judgment on the merits upon which an award of attorneys fees may be based. We disagree. Jones sought attorneys fees under Tex.Civ. Prac. & Rem.Code Ann. §§ 37.009 and 38.-001 (Vernon 1986). Jones has prevailed on its claim for a working interest share in the Geffert No. 1 Well's production. We have already determined the attorneys fees awarded by the trial court to be reasonable.

The trial court's judgment is AFFIRMED. Costs are adjudged equally between the parties to this appeal.

## OPINION ON MOTION FOR REHEARING

█ On Motion for Rehearing, Pend Oreille calls our attention to the fact that a dispute exists concerning title that would effect distribution of royalty payments from the Geffert No. 1 Well. We agree and grant Pend Oreille's motion for rehearing concerning this point. Tex.Nat.Res. Code Ann. § 91.403(b)(1) (Vernon Supp. 1990), provides that interest is not applicable on payments that are withheld or suspended because of "a dispute concerning title that would effect distribution of payments".

The subject matter of the lawsuit and the evidence shows that Pend Oreille disputed Jones' title to the royalty payments from the Geffert No. 1 Well. Based on this title dispute, Pend Oreille refused to pay Jones these royalties. We therefore render judgment that Jones is not entitled to an award of statutory prejudgment interest on these royalties. *See* Tex.Nat.Res.Code Ann. § 91.403(b)(1) (Vernon Supp.1990). The trial court's judgment is reformed to delete the $41,518.78 award of statutory prejudg-

ment interest. In all other respects the motions for rehearing are overruled.